Argued and submitted May 12, decision of Court of Appeals affirmed; judgment
of circuit court reversed, and case remanded to circuit court for further
proceedings September 17, 2009

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## JOE GRANT RUDDER,
aka Joseph Grant Rudder,
*Respondent on Review.*

### (CC 05CR0568; CA A129931; SC S056443)

217 P3d 1064

Michael A. Casper, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief were John R. Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.

Erica Herb, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

GILLETTE, J.

## GILLETTE, J.

In this criminal case, the Court of Appeals overturned defendant's conviction for possession of a controlled substance on the ground that a police officer's search of defendant's pants pocket was unlawful and that evidence obtained in that search—the controlled substance—therefore should have been suppressed. The state sought review, arguing that the search, which involved looking into defendant's pocket after he was stopped on suspicion of involvement in a residential burglary, was permissible under the "officer safety" doctrine described in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987). We allowed the state's petition, but conclude that the search was unlawful. We therefore affirm the decision of the Court of Appeals.

The record discloses the following facts: At 4:00 a.m. on August 10, 2004, the Coos Bay police dispatcher sent Officer Babb to investigate an "active burglar alarm" at a residential address. As Babb approached the address in his patrol car, he saw defendant walking down the street in the opposite direction, away from the area of the alarm. Babb stopped defendant and told him he was investigating a burglar alarm in the area. Defendant responded that he had heard the alarm and offered to provide identification to Babb. Defendant handed over his driver's license, which showed that he lived a few blocks away.

Babb observed that defendant was sweating profusely and appeared nervous, that his hands were shaking, and that there were bulges in his front pants pockets. He asked defendant what was in his pockets. Defendant pulled a set of keys out of his pocket. However, Babb still could see a bulge in one of defendant's pockets and asked what else was in there. Defendant reached back into his pocket and pulled out a few coins, but a clear bulge still remained. Babb then told defendant that he could see that there still was something in his pocket and asked for consent to search the pocket. Defendant replied that he did not want Babb to look in his pockets and that he wanted to leave, and he started to walk away.

At that point, another police officer, Mitts, who recently had arrived on the scene, told defendant to stop and

put his hands up and away from his body. Defendant complied. Babb then attempted to conduct a patdown search of defendant, but defendant turned away when Babb tried to touch his pocket. Babb instructed defendant to stop moving, but defendant turned away a second time when Babb tried to pat down his pocket. At that point, Babb and Mitts placed handcuffs on defendant "because he wouldn't obey instructions and would [not] let us check his pockets." But then, instead of completing the patdown, Babb put his finger into defendant's pocket, pulled it open, and shined his flashlight into it. Seeing a small green plastic container, Babb asked defendant "if that was his dope." Defendant responded that it was. Babb then seized the container, which contained a white crystalline substance, and took defendant into custody. He cited defendant for possession of a controlled substance and released him.[1] Defendant was indicted on the drug possession charge when a test disclosed that the material inside the seized container was methamphetamine.

At an omnibus hearing held before trial, defendant moved to suppress all evidence obtained in the August 10, 2004, incident on the ground that that evidence was the product of an unlawful stop and an unlawful search of defendant's pocket. The state asserted various theories to explain why the evidence was lawfully obtained, including its present theory that the search of defendant's pocket was justified under the "officer safety" doctrine.

In support of its arguments, the state offered Babb's testimony. Babb described the encounter with defendant that we have summarized above. He also testified about his thinking at the time. He stated that, in the course of the encounter, he formulated a belief that defendant had one of three things in his pocket—stolen property from the burglary, a weapon, or controlled substances. He also testified that, to him, defendant's actions raised officer safety concerns:

"Q: When you were attempting to pat [defendant] down, and he was moving away, were you concerned about that?

---

[1] Shortly after he arrested defendant, Babb discovered that the burglar alarm had been a false one. Accordingly, the only charges brought against defendant involved his possession of the controlled substance found in his pocket.

"A:  I was very concerned about that.

"Q:  Why?

"A:  Because, again, he's hiding something from me. And I don't know if this is a weapon, or what he's got there. But, if I'm patting someone down, and they're pulling away from me and not following instructions, then that's an officer-safety risk."

Babb later stated, more explicitly, that he was concerned that defendant "might possibly have a weapon." Babb did not provide any explanation as to why, after defendant was handcuffed, he looked directly into defendant's pocket, rather than completing the patdown.

At the close of the hearing, the court orally announced that it found Babb's testimony to be credible, thus suggesting that it was adopting Babb's testimony as fact. The court also announced certain legal conclusions, including (1) that, although the initial encounter between defendant and Babb was "conversational," it ultimately became a stop; (2) that, in light of the circumstances of the encounter, *i.e.*, it occurred at 4:00 a.m., in close proximity to an active burglar alarm, defendant was observed walking away from the area of a ringing burglar alarm, and defendant was wearing dark clothes and appeared to be the only person on the street, the stop was supported by a reasonable suspicion that defendant had committed a crime; (3) that Babb believed that defendant might have a weapon and might pose a safety risk and, in light of defendant's appearance and actions, Babb's belief was reasonable or, at least, should not be "second guessed"; and (4) that, even after defendant was handcuffed, Babb still could have concerns about what was in the pocket and therefore was entitled to "conduct some additional looks in a pocket like that." In short, the court concluded that the direct search of defendant's pocket was lawful and denied defendant's motion to suppress. The case proceeded to trial and defendant was found guilty of and sentenced for possession of a controlled substance.

Defendant appealed, arguing that, contrary to the trial court's conclusions, Babb lacked the requisite level of suspicion of criminal involvement to stop defendant, and that Babb's visual inspection of the contents of defendant's pocket

could not be justified as an officer safety precaution. The Court of Appeals, sitting en banc, disagreed with defendant's first point: It concluded that Babb could lawfully stop defendant, because Babb reasonably suspected that defendant was connected to an apparent burglary. The court also concluded that Babb lawfully could conduct a standard patdown of defendant's person, because he reasonably believed that defendant might pose an immediate threat to Babb's own safety. *State v. Rudder*, 219 Or App 430, 434-40, 183 P3d 212 (2008). However, the court was divided with respect to the search of defendant's pocket. The majority concluded that, "to justify a *more* intrusive search[, *i.e.*, an examination of the interior of defendant's pocket] under Article I, section 9[, of the Oregon Constitution], it was incumbent on the state to demonstrate that the nature and the extent of the perceived danger required Babb to conduct a more intrusive search * * *." *Id.* at 436 (emphasis added). The majority concluded that the state had failed to make that required showing—that it had "fail[ed] to demonstrate on the record the specific and articulable facts that establish that defendant posed an immediate threat to the officers' safety after defendant was handcuffed * * *." *Id.* at 438.[2]

Before this court, the state argues that the Court of Appeals applied the officer safety doctrine too narrowly—that it erroneously concluded that the state must show that the circumstances *required* the particular safety measure be taken and that *no less intrusive measure* would have been adequate. The state contends that the proper focus of an officer safety inquiry is on whether the action taken was "reasonable" under the totality of the circumstances as they appeared to the police officer at the time that the police officer decided to act. The state contends that, from that perspective, Babb's decision in the present case to look directly into defendant's pocket was reasonable. Defendant responds that the Court of Appeals' majority *did* apply a "reasonable under the totality of the circumstances" test and properly concluded

---

[2] The dissent concluded that the search was lawful. It argued that the majority's focus on the events that occurred after defendant was handcuffed was too narrow, and that the proper focus was on the totality of the circumstances at the time when Babb determined that defendant posed an immediate threat. *Rudder*, 219 Or App at 440 (Wollheim, J., dissenting).

that the particular action at issue—looking directly into defendant's pocket—went beyond what was reasonable under the circumstances.

■　　It is worth acknowledging, at this point, that an Oregon statute explicitly provides for an external "frisk" of persons who have been stopped by police any time the police have a reasonable suspicion that that person is armed and dangerous to them. The same statute, ORS 131.625, allows a police officer who feels what the officer reasonably suspects is a weapon in the course of such a frisk to "take such action as is reasonably necessary to take possession of the weapon," including, it would seem, proceeding to a more direct and intrusive search of the person in question.[3] Clearly, the police officer's action at issue here—looking directly into defendant's pocket, when there had been no external frisk, much less one that suggested the presence of a weapon—was not authorized by that statute. On the other hand, defendant has never suggested that Babb's failure to conform his conduct to ORS 131.625 is grounds for excluding the evidence at issue— and, in fact, Oregon law precludes exclusion on that ground.[4]

■ ■　　Defendant relies, instead, on the prohibition on unreasonable searches and seizures in Article I, section 9, of the Oregon Constitution, which provides:

---

[3] ORS 131.625 provides:

"(1) A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and dangerous to the officer or other persons present.

"(2) If, in the course of the frisk, the peace officer feels an object which the peace officer reasonably suspects is a dangerous or deadly weapon, the peace officer may take such action as is reasonably necessary to take possession of the weapon."

For purposes of the statute, a "frisk" is an "external patting of a person's outer clothing." ORS 131.605(3).

[4] ORS 136.432, enacted as Oregon Laws 1997, chapter 313, section 1, provides:

"A court may not exclude relevant and otherwise admissible evidence in a criminal action on the grounds that it was obtained in violation of any statutory provision unless exclusion of the evidence is required by:

"(1) The United States Constitution or the Oregon Constitution;

"(2) The rules of evidence governing privileges and the admission of hearsay; or

"(3) The rights of the press."

"No law shall violate the right of the people to be secure in their persons, houses, papers and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

It is well settled under that provision that a warrant normally is a prerequisite to any search and that, as a general rule, warrantless searches are *per se* unreasonable unless they fall within one or another of the established exceptions to the warrant requirement. *See, e.g., State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (so stating).

The parties appear to agree that the relevant exception in the present case is the "officer safety" doctrine described in *Bates*. In *Bates*, this court held that:

"Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

304 Or at 524. Significantly, the court in *Bates* stressed that officer safety measures should be examined with considerable deference to the judgments of the police officers on the scene:

"As we noted in [*State v.*] *Riley*, [240 Or 521, 525, 402 P2d 741 (1965)], it is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

*Id.* at 524-25.

In its arguments about this case, the state focuses on the repeated theme of "reasonableness" in the foregoing quotations from *Bates*. It argues that the scrutiny that the Court of Appeals applied to the events in the present case and, particularly, the court's suggestion that the state had failed to demonstrate that the circumstances required something more than a patdown for weapons, is incompatible with the doctrine's "reasonableness" standard. The state explains:

> "Reasonableness is rarely a black-or-white concept; it typically is a fluid one that depends on a variety of facts and is not conducive to a one-size-fits-all approach. Within the range of 'reasonable' choices are some that may be less intrusive than others. Thus, merely because one particular action may be reasonable, it does not follow that a different option is therefore unreasonable."

The state goes on to suggest that, once an officer develops a reasonable suspicion that a person might present a safety risk, any action chosen from within a whole spectrum of "reasonable options" is permissible—including direct examination of the contents of a person's pocket, as occurred in the present case.

█ The state's general description of the concept of reasonableness is unobjectionable. In fact, this court often has stated that police officers must be allowed "considerable latitude" to take protective measures when they reasonably feel threatened. *See, e.g., Bates*, 304 Or at 524-25; *State v. Foster*, 347 Or 1, 10, 217 P3d 168 (2009) (court will not second-guess reasonable decisions made under pressure by police). However, the state's suggestion that a "whole spectrum" of variously intrusive measures will be "reasonable" in any circumstance does little to advance the reasonableness inquiry and, in fact, could have the effect of short-circuiting any serious inquiry into the reasonableness of the specific protective measure that is at issue. The question that courts must confront in these circumstances is whether the *particular* step taken by the police was one that was reasonable under the *particular* circumstances, not whether that step was within the range of reasonable responses to officer safety concerns *in general*.

■  We emphasize that the concept of reasonableness in this context is not biased in favor of the concerns of the police. Although this court is sensitive to the dangers inherent in police work and to the difficulties inherent in officer safety decisions, that does not and cannot mean that we regard those concerns as having greater weight than the constitutional right of all persons—even those who have been stopped on suspicion of criminal activity—to be free of unreasonable searches and seizures. If that constitutional right is to retain any vitality in the context of police stops, police officers must understand that the officer safety doctrine does not excuse protective measures that are disproportionate to any threat that the officers reasonably perceive.[5]

■  That does not mean that evidence obtained as a by-product of officer safety measures must be suppressed unless the state demonstrates that the police used the "least intrusive" means that were available to protect themselves. *See Foster*, 347 Or at 11 (rejecting that "least intrusive" or "least restrictive alternative" rationale). Neither does it mean that the state must demonstrate that the circumstances "required" the particular response that the officer's chose. *Id.* The idea of proportionality does not require pinpoint accuracy; it is perfectly consistent with the latitude that we have afforded to police and, more generally, with this court's recognition that "reasonable" conduct can encompass a range of choices.

With the foregoing considerations respecting the principle of proportionality in mind, we consider the particular protective measure that Babb took in this case—a direct examination of the contents of defendant's pocket—which the state contends was a reasonable one under the totality of the circumstances.

---

[5] Although this court's cases heretofore have not expressly discussed that principle, we think it is implicit in them. *See, e.g., State v. Cocke*, 334 Or 1, 8, 45 P3d 109 (2002) (police officers' generalized concern that persons who posed threat of harm might be in building might justify protective sweep of arrestee's apartment but not of defendant's separate apartment); *State v. Hoskinson*, 320 Or 83, 87-88, 879 P2d 180 (1994) (when defendant was arrested for driving while suspended, police officer's generalized concern that his wallet might contain weapon or other means of escape did not justify search of wallet).

■ The state begins with the proposition that, when Babb first encountered defendant, he had a reasonable suspicion that defendant was involved in a crime. In that regard, the state points to evidence that Babb was responding to a 4:00 a.m. burglar alarm, that defendant was walking away from the source of the alarm, that he was wearing dark clothes, that he was sweating profusely and grew increasingly nervous during the course of the encounter, that his pockets were visibly bulging, and that, when asked about the contents of his pockets, he furtively and selectively removed items. The state also points to Babb's testimony that he knew that defendant was hiding something and that he was "very concerned" that it might be a weapon. The state concludes that, at that point, Babb was justified in detaining defendant to investigate further and also was justified in "protect[ing] his safety during the potentially volatile encounter by determining whether defendant was carrying a weapon."

We agree. The question, however, is whether the measures that Babb took to protect his safety were reasonable under the circumstances, when "reasonableness" incorporates both the idea that police are afforded latitude in protecting themselves from danger and the idea that the measures used must be reasonably proportionate to the perceived threat.

Initially, Babb tried to conduct a patdown of defendant's exterior clothing for weapons. However, when defendant twice turned away, Babb and his associate handcuffed defendant, opened his pocket, and visually inspected the pocket's contents. Notably, Babb's initial patdown approach was the type of limited search that this court generally has approved when officer safety concerns arise in the course of a lawful police stop. *See, e.g., State v. Miglavs*, 337 Or 1, 14, 90 P3d 607 (2004) (illustrating proposition), *State v. Stanley*, 325 Or 239, 244-46, 935 P2d 1202 (1997) (same). Although a patdown is an intrusion (indeed, it is a search), it normally is sufficient to identify those objects that are relevant to officer safety concerns while leaving other information and objects relatively private.

■ Babb's chosen alternative—opening and inspecting the contents of a suspect's pocket—is a different matter. It is

a form of search that is more intrusive than a patdown and that normally only occurs incident to a lawful arrest, when police are authorized to search the arrestee's person and effects for evidence of the crime for which the arrest was made. *See, e.g., State v. Owens,* 302 Or 196, 200-05, 729 P2d 524 (1986) (approving search of defendant's purse at time of arrest for shoplifting). Put differently: A patdown, because of its limited intrusiveness, is constitutionally permissible if it is based on a reasonable suspicion of a threat to officer safety. But intrusion *into* a suspect's clothing requires something more—either probable cause or some greater justification than was present here.[6]

■      Indeed, the difference between those two kinds of searches, and the circumstances that justify them, are so widely recognized in the law of this state and in federal law that a police officer reasonably can be expected to recognize the distinctions involved. *See, e.g., State v. Hoskinson,* 320 Or 83, 87, 879 P2d 180 (1994) (in context of search incident to arrest, although "patdown or limited search for weapons to protect the officer or to prevent escape would be justified whenever a person is taken into custody," any further search to protect officer safety must be based on reasonable suspicion, supported by specific and articulable facts, that the person poses a serious threat of harm or escape); *see also Terry v. Ohio,* 392 US 1, 30-31, 88 S Ct 1868, 20 L Ed 2d 889 (1968) (under federal constitution, in absence of probable cause to arrest, search for weapons for protection of the officer must be strictly circumscribed; officer is entitled "to conduct a carefully limited search of the outer clothing * * * in an attempt to discover weapons which might be used to assault him"). The constitution requires us to adhere to the principle that an officer's reasonable suspicion that a suspect might have a weapon on the suspect's person can justify a patdown, but that something more—such as, for example, a reasonable belief that the suspect is reaching for that weapon—is required to justify a more intrusive search.[7]

[6] Here, Babb had reasonable suspicion, but not probable cause, to believe that defendant either was in possession of a weapon or of evidence of a crime.

[7] *State v. Ehly,* 317 Or 66, 854 P2d 421 (1993) is illustrative of what can suffice. In *Ehly,* this court held that police officers were justified in searching defendant's gym bag for weapons as a safety precaution, although he was not under arrest at

The state suggests that the evidence shows that Babb *was* dealing with something more than ordinary concerns about the possible presence of a weapon. It points to the testimony that defendant turned his body away each time Babb attempted to patdown his pockets, even after Babb instructed him to stop moving. Based on that testimony, the state contends that "defendant's own actions, and his refusal to cooperate with lawful orders, thus converted an already risky situation into an exceedingly dangerous confrontation."

We do not agree that defendant's failure to cooperate turned this encounter into one that justified a more intensive search than ordinarily would have been permissible. Certainly, defendant actively and repeatedly thwarted Babb's attempts to check him for the presence of a weapon, but failing to cooperate in a search does not, by itself, signify an intent to use a weapon. Indeed, Babb's initial response to defendant's evasive behavior was itself reasonable: Babb reasonably was concerned that defendant was carrying a weapon, and defendant did not permit Babb to resolve his concern, so Babb handcuffed defendant to assure that he could do so. Handcuffing or otherwise restraining defendant for the limited purpose of carrying out the patdown was permissible. Had Babb thereafter simply conducted the patdown, all would have been well. But Babb instead chose a more invasive course.

On this record, that choice was not permissible. Defendant did not appear to reach for his pockets and his hands were visible during the entire encounter. He did not otherwise threaten Babb or anyone else. Quite simply, there is nothing in the record that distinguishes the circumstances in this case from any case in which a police officer has familiar grounds for a reasonable concern that the person he or she

---

the time of the search. We concluded that the police officers reasonably could have believed that defendant was reaching for a gun in the bag (not merely that he *might* be carrying one). We based that conclusion on the facts that the police officers knew that the defendant had prior felony convictions and was a methamphetamine user, that he appeared to be under the influence of methamphetamine, that they had seen a known associate of defendant's, whom they knew to carry automatic weapons, leave the vicinity moments before the encounter with defendant, and that defendant had his hands in a bag, the contents of which he appeared to be hiding and which could have contained a firearm.

has stopped might be armed. And, as we already have indicated, such grounds and such a suspicion justify a patdown of a suspect's exterior clothing for weapons, but they are insufficient to justify the more intrusive search that Babb carried out in this case. The Court of Appeals was correct in so holding.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.