Argued and submitted August 27, reversed and remanded October 15, 2008

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ROGER EDWARD STANLEY,
*Defendant-Appellant.*

Washington County Circuit Court
C052691CR; A132361

195 P3d 454

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs were

Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, and Schuman, Judge, and Riggs, Senior Judge.

BREWER, C. J.

## BREWER, C. J.

Defendant appeals a judgment of conviction for possession of a controlled substance, *former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005). He assigns as error the denial of his motion to suppress evidence of methamphetamine that was seized by the police from his person after he was stopped. The issue on appeal is whether the search of defendant's pocket, from which the controlled substance was seized, was permissible under Article I, section 9, of the Oregon Constitution. In our review, we are bound by the trial court's findings of historical fact if they are supported by evidence in the record, and we review to decide whether the trial court correctly applied the applicable legal principles to those facts. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). We reverse and remand.

Deputy Medlock responded to a domestic disturbance report involving CF and BF, a married couple who were living separately. Medlock received information from a dispatcher that CF and another male had used a pickup to block BF's progress on a public roadway so that she could not proceed and that CF had interrupted a 9-1-1 call that BF thereafter placed from her residence. When Medlock arrived at BF's residence, he saw defendant near his pickup, which was parked in the driveway. CF also was present. Based on the dispatch report, and because of his concern for officer safety, Medlock handcuffed CF and placed him in the back of his patrol car. Medlock's concerns were heightened because the call involved domestic violence, the location was remote, the situation involved attending to three people, a good deal of the area was "unsecured," and his backup officers had not yet arrived.

Medlock observed a small bulge in defendant's left pants pocket. The object was consistent with the size and shape of the cylinder of a small revolver. Defendant placed his left hand in that pocket. Medlock told him to remove his hand from the pocket. Medlock then told defendant that he needed to pat him down. Medlock twice asked defendant if he had any weapons. Both times defendant said, "No." Defendant then placed his left hand in his left pocket once again. Medlock ordered defendant to take his hand out of his pocket

and warned defendant that, if he did not comply, Medlock would detain and search him.

Shortly thereafter, two other officers, Anderson and Mitchum, arrived at the scene. Medlock asked the other officers to watch defendant while Medlock went into the residence to further interview BF. Anderson and Mitchum spoke to defendant in an effort to gain his cooperation. Defendant was polite but appeared nervous. Anderson and Mitchum observed the bulge in defendant's left pocket. Anderson believed that the object was consistent with the shape of a pocketknife or the cylinder of a revolver. The officers asked defendant if they could pat him down; defendant declined and, once again, placed his hand in his left pocket.

Mitchum told defendant that his actions were making the officers nervous and proposed to defendant that, if he permitted the officers to pat him down, perhaps he could put his hand back in his pocket. Mitchum repeated that statement several times. Medlock then returned and asked defendant if the officers could pat him down. Defendant said that the item in his pocket was not a weapon but that he was "embarrassed" by it. The officers said that they were not interested in embarrassing material and that, if the item was merely embarrassing, it could be kept between them. Defendant then agreed to a patdown. At that point, Medlock returned to other aspects of the investigation.

Mitchum conducted the patdown. When he reached defendant's left pants pocket, defendant began to squirm, said, "No," and twisted away. Defendant became more agitated and started rocking back and forth. The officers reassured defendant that they only wanted to make sure that nobody got hurt and that, if he satisfied their concerns, he would be free to leave. Defendant again consented to a patdown, but, when the officers approached his left pants pocket, he squirmed and twisted away. At that point, Anderson grabbed one of defendant's hands to control him and told defendant that he was going to pat him down. Defendant objected. Rather than proceeding with a patdown of the pocket, Anderson opened the pocket so that he could look inside. Anderson saw that the object inside was a transparent canister containing a white substance that, based on his

training and experience, Anderson recognized as methamphetamine. Anderson seized the canister and arrested defendant for possession of a controlled substance.

■    In a single assignment of error on appeal from his ensuing conviction, defendant asserts that the trial court erred in denying his motion to suppress the evidence found in the canister on the ground that the officer could not lawfully look into defendant's pocket without first patting down the outside to determine whether the bulge in the pocket was consistent with a weapon. The state replies that the search was justified by officer safety concerns and that, under the totality of circumstances, the officers were not required to patdown defendant's pocket before opening it for the purpose of inspecting its contents.

■■    The officer safety doctrine, which applies to officer-citizen encounters, creates an exception to the warrant requirement of Article I, section 9, in some situations. In *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), the Supreme Court announced the governing test for that exception:

> "Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

The test inquires "whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made," *id.* at 525, and requires consideration of both the nature and extent of the perceived danger and the degree of intrusion resulting from the officer's conduct. *Id.* at 526. Also,

> "it is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations."

*Id.* at 524. Finally, the state has the burden of establishing the validity of a warrantless search or seizure. *State v. Tucker*, 330 Or 85, 89, 997 P2d 182 (2000).

Defendant asserts that this case is controlled by our decision in *State v. Rudder*, 219 Or App 430, 183 P3d 212 (2008), which was decided after the trial court made its ruling and after the case was initially briefed on appeal. In *Rudder*, we concluded that the trial court had erred in denying the defendant's motion to suppress evidence of controlled substances found in a Tupperware container taken from the defendant's pocket during an officer safety search, where the safety concerns had dissipated after the officers handcuffed the defendant. We reasoned:

> "First, [the officer] did not testify or provide any specific or articulable facts as to why defendant posed an immediate threat of serious physical injury to him or the other officer after defendant was handcuffed. Indeed, [the officer] commenced a patdown of defendant's exterior, the least intrusive search that he could have conducted. When defendant failed to cooperate with the patdown, [the officer] handcuffed him, but, insofar as the record before us demonstrates, [the officer] did not continue or complete the patdown of defendant's exterior. Rather, without providing any explanation as to the need for a more intrusive search for officer safety purposes, he immediately engaged in a more intrusive search by pulling open defendant's pocket and searching its interior. In the absence of an explanation by [the officer] as to why it was necessary to look into the interior of defendant's pocket for weapons without first completing the patdown of the exterior of his pocket, we are left to speculate whether the precautions taken were reasonable under the circumstances at the time of the search. In other words, in order to justify a more intrusive search under Article I, section 9, it was incumbent on the state to demonstrate that the nature and the extent of the perceived danger required [the officer] to conduct a more intrusive search than merely completing the patdown of defendant's exterior."

*Id.* at 436.

At oral argument, the state asserted that this case is distinguishable from *Rudder* because, in *Rudder*, the bulge in the defendant's pocket was "undifferentiated," whereas,

here, the bulge appeared solid and cylindrical, thus assuming the visual appearance of a weapon. It is true that the officer in *Rudder* testified that he did not know whether the item in the defendant's pocket was a weapon. In that regard, we stated:

> "[The officer] did not testify that he was searching only for weapons when he looked into defendant's pants pocket and saw a small Tupperware container, nor did he explain why the bulge in defendant's pants pocket from a small Tupperware container could reasonably be interpreted as the bulge from a concealed weapon."

*Id.* at 438. However, we did not conclude that, if, based on a purely visual observation, the officer had believed that the object was a weapon, a search without a confirming patdown would have been permissible. Instead, we stated:

> "The expanded intrusion into defendant's pocket might have been justified, for instance, if [the officer] had felt what appeared to be a weapon *while patting down the exterior of defendant's pants pocket after defendant was handcuffed*; under those circumstances, it would have been constitutionally permissible for him to have looked into the pocket. But that kind of evidence is missing from the record before us."

*Id.* (emphasis added). Thus, the dispositive circumstance in *Rudder* was the fact that the defendant was handcuffed and under the officer's control when the safety search was conducted; under that circumstance, the officer was not permitted to open the defendant's pocket without first patting it down to determine whether it felt like a weapon. *See also State v. Weems*, 190 Or App 341, 346-47, 79 P3d 884 (2003) (concluding that search was unlawful where officer safety concerns had dissipated because patdown after the defendant was handcuffed did not raise any further concern that the defendant posed a threat).

What is notably missing thus far from the trial court's findings and our discussion of the facts of this case is any indication whether defendant, like the defendant in *Rudder*, was handcuffed and under the officers' control when Anderson looked inside defendant's pants pocket. At oral argument, the state candidly conceded that, even though the

trial court made no pertinent finding in that regard, the record supports only the inference that Mitchum had handcuffed defendant before Anderson looked inside the pocket. Because our review of the record confirms the accuracy of that concession, we conclude that this case is not meaningfully distinguishable from *Rudder*. The state produced no evidence as to why defendant continued to present a threat after he was handcuffed. Accordingly, the search of his pocket without a preliminary patdown was not justified by the officer safety exception to the warrant requirement of Article I, section 9.

Reversed and remanded.